209 F.3d 331 (4th Cir. 2000)
 UNITED STATES OF AMERICA, PLAINTIFF-APPELLANT,
v.
JAMES S. DEATON; REBECCA DEATON, DEFENDANTS-APPELLEES.
ENVIRONMENTAL DEFENSE FUND, INCORPORATED; AMERICAN FARM BUREAU FEDERATION; PACIFIC LEGAL FOUNDATION; THE CHESAPEAKE BAY FOUNDATION, INCORPORATED, AMICI CURIAE.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
JAMES S. DEATON; REBECCA DEATON, DEFENDANTS-APPELLANTS.
ENVIRONMENTAL DEFENSE FUND, INCORPORATED; AMERICAN FARM BUREAU FEDERATION; PACIFIC LEGAL FOUNDATION; THE CHESAPEAKE BAY FOUNDATION, INCORPORATED, AMICI CURIAE.
 No. 98-2256, 98-2370.
 U.S. Court of Appeals, Fourth Circuit.
 Argued: October 28, 1999.
April 07, 2000.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore.
 Marvin J. Garbis, District Judge. (CA-95-2140-MJG)Argued: Ethan Gregory Shenkman, Environment & Natural Resources Division, United States Department OF Justice, Washington, D.C., for Appellant. Raymond Stevens Smethurst, Jr., Adkins, Potts & Smethurst, L.L.P., Salisbury, Maryland, for Appellees.
 ON Brief: Lois J. Schiffer, Assistant Attorney General, Lynne A. Battaglia, United States Attorney, James C. Howard, Assistant United States Attorney, David C. Shilton, Environment & Natural Resources Division, United States Department OF Justice, Washington, D.C., for Appellant. Duane J. Desiderio, National Association OF Homebuilders, Washington, D.C.; Virginia S. Albrecht, Hunton & Williams, Washington, D.C., for Appellees. Timothy D. Searchinger, Environmental Defense Fund, Washington, D.C., for Amicus Curiae Environmental Defense Fund. John J. Rademacher, General Counsel, American Farm Bureau Federation, Park Ridge, Illinois; Timothy S. Bishop, Jeffrey W. Sarles, Mayer, Brown & Platt, Chicago, Illinois, for Amicus Curiae Farm Bureau. Robin L. Rivett, Anne M. Hayes, Pacific Legal Foundation, Sacramento, California, for Amicus Curiae Pacific Legal Foundation. Roy A. Hoagland, Virginia Staff Attorney, The Chesapeake Bay Foundation, Inc., Richmond, Virginia, for Amicus Curiae Chesapeake Bay Foundation.
 Before Wilkinson, Chief Judge, and Luttig and Michael, Circuit Judges.
 
 
 1
 Reversed in part, dismissed in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Chief Judge Wilkinson and Judge Luttig concurred.
 
 OPINION
 Michael, Circuit Judge
 
 2
 The United States sued James and Rebecca Deaton, alleging that they violated §§ 301 and 404 of the Clean Water Act, 33 U.S.C. §§ 1311, 1344, by sidecasting dredged material as they dug a drainage ditch through a wetland. The district court ultimately awarded summary judgment to the Deatons, and the government appeals. We reverse, holding that sidecasting in a jurisdictional wetland is the discharge of a pollutant under the Clean Water Act. We dismiss the Deatons' cross-appeal for lack of appellate jurisdiction.
 
 I.
 
 3
 On November 22, 1988, James Deaton signed a contract to buy a twelve-acre parcel of land in Wicomico County, Maryland, subject to the condition that it was suitable for developing a small residential subdivision. Deaton immediately applied to the Wicomico County Health Department for a sewage disposal permit for a five-lot "single family subdivision." The Health Department denied the permit on April 26, 1989, because the groundwater elevations were unacceptably high at the disposal sites proposed by Deaton and his consultant. The department commented that "[t]he majority of the parcel... is very poorly drained and would severely restrict the function of the onsite sewage disposal systems." There was a "very limited area" that might warrant evaluation, the department said, if it proved to be within the property boundary. In late April 1989, after the permit was denied, Deaton contacted the U.S. Department of Agriculture, Soil Conservation Service (SCS), to discuss the wetness problem on the twelve-acre parcel. Deaton was referred to Glen Richardson, who agreed to examine the site. According to Deaton, Richardson suggested that the problem could be corrected by digging a ditch through the middle of the property. Deaton and his wife (Rebecca) decided to go ahead with the purchase of the land, and title was transferred to them in June 1989.
 
 
 4
 Before any ditching work began, the property was also inspected by Michael Sigrist, District Conservationist at the SCS in Wicomico County. Deaton and Sigrist walked over the property together, and Deaton told Sigrist that he wanted to dig a large ditch to drain the area. Sigrist saw hydric soils (which are typical of wetland areas), areas of standing water, "a large, low wet area" in the center of the parcel, and non-tidal wetlands. Water was flowing from the property into a culvert that connects to (or is part of) Perdue Creek. (The waters of Perdue Creek end up in the Wicomico River, a tributary of the Chesapeake Bay.) Sigrist advised Deaton that a large portion of his property contained non-tidal wetlands and that he would need a permit from the U.S. Army Corps of Engineers (the Corps) before undertaking any ditching work. Deaton ignored Sigrist's advice and hired a contractor to dig a drainage ditch across the property. Using a back hoe, a front-end track loader, and a bulldozer, the contractor dug a 1,240 foot ditch that intersected the areas that Sigrist had identified as wetlands. As he dug, the contractor piled the excavated dirt on either side of the ditch, a practice known as sidecasting.
 
 
 5
 In July 1990 the Corps learned of possible Clean Water Act violations on the Deaton property. A Corps ecologist, Alex Dolgos, inspected the site and concluded that it contained wetlands, that those wetlands were "waters of the United States" under the Clean Water Act, and that the ditching and fill work that had taken place required a permit. On August 7 and 8, 1990, the Corps issued stop-work orders to Deaton and his contractor, warning them that their placement of fill material in a non-tidal wetland violated § 404 of the Clean Water Act, 33 U.S.C. § 1344, and that no further work should be done without a permit. Deaton filed a joint state and federal application in December 1990, seeking permits to ditch and fill wetlands in order to construct an eighteen-lot subdivision. That application was returned as incomplete on February 15, 1991, and was never resubmitted. Over the next three years Deaton engaged several consultants to inspect the property, negotiate with the Corps, and prepare a remediation plan. No remediation ever took place, however, and on July 21, 1995, the government filed a civil complaint alleging that the Deatons had violated the Clean Water Act by discharging fill material (the dirt excavated from the ditch) into a regulated wetland.
 
 
 6
 The government moved for partial summary judgment, seeking rulings that jurisdictional wetlands (waters of the United States) existed on the property, that the Deatons had violated the Clean Water Act by filling those wetlands, and that the Deatons were therefore liable for the restoration of the property and subject to civil penalties. The Deatons cross-moved for summary judgment, asserting that the portions of the property affected by the fill material were not wetlands under the Corps' regulations, that the property was not a wetland adjacent to waters of the United States (and thus was not subject to the Clean Water Act), see 33 C.F.R. § 328.3, and that sidecasting dirt excavated from a ditch in a wetland did not require a permit under the Act. On September 22, 1997, the district court granted partial summary judgment to the government, holding that any wetlands on the property were subject to the Clean Water Act and that sidecasting excavated material into those wetlands was the discharge of a pollutant under the Act. The Deatons' motion for summary judgment was denied. According to the district court, further proceedings would be necessary to determine the size and location of any wetlands on the Deaton property.
 
 
 7
 On December 23, 1997, this court decided United States v. Wilson, 133 F.3d 251 (4th Cir. 1997). One issue in that case was whether sidecasting in a wetland without a permit violated the Clean Water Act. The panel split three ways, with one judge concluding that sidecasting did not constitute the discharge of a pollutant under the Act, one judge concluding that it did, and one judge concurring in the judgment without reaching the sidecasting question. After Wilson was decided, the district court reconsidered its award of partial summary judgment to the government. In a subsequent order (entered June 23, 1998) the district court noted that although it agreed with the judge in Wilson who said that unauthorized sidecasting in a wetland is against the law, see Wilson, 133 F.3d at 266-75 (op. of Payne, J.), it predicted that this court would adopt the reasoning of the judge who concluded that sidecasting is not the discharge of a pollutant, see Wilson, 133 F.3d at 258-60 (op. of Niemeyer, J.). On that analysis the district court vacated its prior determination that sidecasting is the discharge of a pollutant under the Act; it then granted summary judgment for the Deatons.
 
 
 8
 The government now appeals the judgment awarded to the Deatons, and the Deatons cross-appeal the district court's (earlier) September 22, 1997, rulings (1) that the Corps properly applied its criteria for determining the presence of wetlands on the Deaton property and (2) that any wetlands on the property are subject to the Clean Water Act. For the reasons discussed below, we hold that sidecasting is the discharge of a pollutant that violates the Act. Our disposition of the sidecasting issue requires a remand and restores the case to its status as of the September 22, 1997, order. Because the September 22, 1997, order is non-final and non-appealable, we lack jurisdiction to consider the issues raised by the Deatons in their cross-appeal.
 
 II.
 
 9
 The Clean Water Act prohibits the discharge, without a permit, of any pollutant into "navigable waters." See 33 U.S.C. §§ 1311(a), 1362(6), (7), (12). The Act defines "navigable waters" as "the waters of the United States, including the territorial seas." Id. § 1362(7). Consistent with the intent of Congress, the Corps has construed "waters of the United States" to include the territorial seas, interstate waters, waters used or susceptible to use in interstate commerce, tributaries of any of these waters, and wetlands adjacent to all of these waters. See 33 C.F.R. § 328.3(a); United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 132-35 (1985).[1] The Corps argues and we assume for purposes of this appeal that the Deatons' property contains wetlands that are subject to the Clean Water Act. The narrow issue before us today is whether sidecasting (that is, the deposit of dredged or excavated material from a wetland back into that same wetland) constitutes the discharge of a pollutant under the Clean Water Act. We hold that it does.
 
 
 10
 The Clean Water Act defines "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). The definition of pollutant, in turn, specifically includes "dredged spoil" that has been "discharged into water." Id. § 1362(6).[2] The piles of dirt dredged up by the Deatons' contractor were, without question, "pollutants" within the meaning of the Act. See Wilson, 133 F.3d at 259 (op. of Niemeyer, J.) ("[D]redged materials, including the native soils excavated by ditching activities, may constitute a pollutant within the meaning of the Clean Water Act."); id. at 269, 274 & n.12 (op. of Payne, J.) (dredged earth is a pollutant). This conclusion, instead of resolving the dispute, merely brings us to its center because the parties disagree fundamentally about what it means to "discharge... a pollutant" into the waters of the United States.
 
 
 11
 The Deatons seize on the word "addition" in the phrase "addition of any pollutant" in the statutory definition of discharge. 18 U.S.C. § 1362(12). They argue that the "ordinary and natural meaning of `addition' means something added, i.e., the addition of something not previously present." Deaton Reply Br. at 18-19. Thus, according to the Deatons, no pollutant is discharged unless there is an "introduction of new material into the area, or an increase in the amount of a type of material which is already present." Wilson, 133 F.3d at 259 (op. of Niemeyer, J.). Because sidecasting results in no net increase in the amount of material present in the wetland, the Deatons argue, it does not involve the "addition" (or discharge) of a pollutant. See National Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1404 (D.C. Cir. 1998) ("[W]e fail to see how there can be an addition of dredged material when there is no addition of material."). We are not convinced by this argument.
 
 
 12
 Contrary to what the Deatons suggest, the statute does not prohibit the addition of material; it prohibits "the addition of any pollutant." The idea that there could be an addition of a pollutant without an addition of material seems to us entirely unremarkable, at least when an activity transforms some material from a nonpollutant into a pollutant, as occurred here. In the course of digging a ditch across the Deaton property, the contractor removed earth and vegetable matter from the wetland. Once it was removed, that material became "dredged spoil," a statutory pollutant and a type of material that up until then was not present on the Deaton property. It is of no consequence that what is now dredged spoil was previously present on the same property in the less threatening form of dirt and vegetation in an undisturbed state. What is important is that once that material was excavated from the wetland, its redeposit in that same wetland added a pollutant where none had been before. See 33 U.S.C. § 1362 (6), (12). Thus, even under the definition of "addition" (that is, "something added") offered by the Deatons, sidecasting adds a pollutant that was not present before.
 
 
 13
 Although we conclude that the Clean Water Act's definition of discharge and its use of the term "addition" are unambiguous, the underlying rationale for defining dredged spoil as a pollutant provides further support for our conclusion. In deciding to classify dredged spoil as a pollutant, Congress determined that plain dirt, once excavated from waters of the United States, could not be redeposited into those waters without causing harm to the environment. Indeed, several seemingly benign substances like rock, sand, cellar dirt, and biological materials are specifically designated as pollutants under the Clean Water Act. See 33 U.S.C. § 1362(6). Congress had good reason to be concerned about the reintroduction of these materials into the waters of the United States, including the wetlands that are a part of those waters.
 
 
 14
 Wetlands perform a vital role in maintaining water quality by trapping sediment and toxic and nontoxic pollutants before they reach streams, rivers, or other open bodies of water. See Office of Technology Assessment, U.S. Congress, Wetlands: Their Use and Regulation 48-50 (1984). Given sufficient time, many (but not all) of these pollutants will decompose, degrade, or be absorbed by wetland vegetation. See id. at 48-49. When a wetland is dredged, however, and the dredged spoil is redeposited in the water or wetland, pollutants that had been trapped may be suddenly released. See id. at 49 ("Natural or manmade alterations of the wetland caused by lowering the water table, dredging, and the like, could mobilize large quantities of toxic materials."); id. at 124 ("A long-term effect of the disposal of contaminated dredged spoil in or near wetlands is the potential bioavailability of toxic chemicals such as oil and grease, pesticides, arsenic, and heavy metals, when the sediments are resuspended periodically."); Wilson, 133 F.3d at 273-74 (op. of Payne, J.) (describing how sidecasting dredged material threatens to release pollutants contained in sub-surface soil). At the same time, the increased drainage brought about by the dredging may render the surrounding wetland unable to reabsorb and filter those pollutants and sediment (the very purpose of dredging is to destroy wetland characteristics). See 40 C.F.R. § 230.41(b) (explaining how discharge of dredged or fill material in wetlands "can degrade water quality by obstructing circulation patterns that flush large expanses of wetland systems, by interfering with the filtration function of wetlands, or by changing the aquifer recharge capability of a wetland"). Even in a pristine wetland or body of water, the discharge of dredged spoil, rock, sand, and biological materials threatens to increase the amount of suspended sediment, harming aquatic life. See id.; Office of Technology Assessment, supra, at 48; see also Wilson, 133 F.3d at 274 (op. of Payne, J.).
 
 
 15
 These effects are no less harmful when the dredged spoil is redeposited in the same wetland from which it was excavated. The effects on hydrology and the environment are the same. Surely Congress would not have used the word "addition" (in"addition of any pollutant") to prohibit the discharge of dredged spoil in a wetland, while intending to prohibit such pollution only when the dredged material comes from outside the wetland. In reaching this conclusion, our understanding of the word "addition" is the same as that of nearly every other circuit to consider the question. See Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 923-25 (5th Cir. 1983) (interpretation of "addition" to include "redeposit" of trees and vegetation dredged or excavated from the wetland itself is consistent with both the purposes and legislative history of the Clean Water Act); United States v. M.C.C. of Florida, Inc., 772 F.2d 1501, 1506 (11th Cir. 1985) (redeposit of spoil churned up by tugboat propellers constituted the discharge of a pollutant under the Clean Water Act), vacated and remanded on other grounds, 481 U.S. 1034 (1987), readopted in relevant part, 848 F.2d 1133 (11th Cir. 1988); Rybachek v. EPA, 904 F.2d 1276, 1285 (9th Cir. 1990) (dirt and gravel extracted by gold miners and redeposited into the stream bed from which it was extracted constituted an "addition" of a pollutant under the Clean Water Act); see also United States v. Bay-Houston Towing Co., 33 F. Supp.2d 596, 606 (E.D. Mich. 1999) (adopting reasoning of Judge Payne's Wilson opinion). But cf. National Mining Ass'n, 145 F.3d at 1404, 1406 (concluding that "incidental fallback" of dredged material into waterway does not constitute the addition of a pollutant, but distinguishing between incidental fallback and sidecasting).
 
 
 16
 For these reasons, we hold that the Clean Water Act's definition of discharge as "any addition of any pollutant to navigable waters" encompasses sidecasting in a wetland. We therefore reverse the district court's June 23, 1998, judgment to the contrary.
 
 III.
 
 17
 As we turn to the Deatons' cross-appeal, it is useful to summarize once more what happened in district court. On September 22, 1997, the district court granted the government's motion for summary judgment in part, ruling (1) that the Corps had used the correct method for determining the existence of wetlands on the Deaton property, (2) that any wetlands on the property were "adjacent wetlands" and therefore subject to the Corps' Clean Water Act jurisdiction, and (3) that sidecasting into a wetland is the discharge of a pollutant under the Clean Water Act. After this court decided Wilson in December 1997, the district court revisited the sidecasting question, reversed itself on that point alone, and entered summary judgment for the Deatons. The Deatons cross-appeal the first two issues from the September 1997 order, namely, whether the Corps properly interpreted and applied its criteria for determining the presence of wetlands and whether any wetlands on their property were subject to Corps' jurisdiction. The September 1997 order left at least one matter open: the district court granted summary judgment for the government only in part, noting that further proceedings would be necessary "to determine the extent of wetlands on the subject property." It is clear, therefore, that the September 1997 order was interlocutory. See O'Connor v. United States, 956 F.2d 48, 52 (4th Cir. 1992).
 
 
 18
 Our reversal of the district court's June 1998 determination that sidecasting does not constitute the discharge of a pollutant under the Clean Water Act simply returns this case to its status as of the September 1997 interlocutory order. Because the Deatons, in seeking review of the September 1997 order, are not appealing from a final order, and no exception to the final order rule applies, we lack jurisdiction to review the issues raised in the cross-appeal. See Taylor v. Waters, 81 F.3d 429, 437 (4th Cir. 1996). The cross-appeal is therefore dismissed.
 
 IV.
 
 19
 The district court's judgment order of June 23, 1998, is reversed, and the cross-appeal filed by the Deatons is dismissed. The case is remanded for further proceedings consistent with this opinion.
 
 
 20
 No. 98-2256 (the direct appeal) is REVERSED; No. 98-2370 (the cross-appeal) is DISMISSED; and the case is REMANDED
 
 
 
 NOTES:
 
 
 [1]
 The Corps has also construed the term "waters of the United States" to apply to "all other waters... the use or degradation of which could affect interstate or foreign commerce." 33 C.F.R.§ 328.2(a)(3). In Wilson this court held that the "could affect" language swept too broadly and exceeded the scope of the Corps' authority under the statute. See Wilson, 133 F.3d at 257.
 
 
 [2]
 Pollutant is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).