261 F.3d 810 (9th Cir. 2001)
 BORDEN RANCH PARTNERSHIP; ANGELO K. TSAKOPOULOS, PLAINTIFFS-APPELLANTS
v.
UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, AN AGENCY OF THE UNITED STATES, DEFENDANTS-APPELLEES
 No. 00-15700
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 9, 2001
Filed August 15, 2001
 
 [Copyrighted Material Omitted]
 Counsel: Arthur F. Coon (argued) and Edmund L. Regalia (argued), Miller, Starr & Regalia, Walnut Creek, California, for the plaintiffs-appellants.
 Sylvia Quast (argued), U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.
 Robin L. Rivett, Pacific Legal Foundation, Sacramento, California, for Amicus Curiae Pacific Legal Foundation, California Farm Bureau Federation, and California Cattlemen's Association.
 Appeal from the United States District Court for the Eastern District of California Garland E. Burrell, District Judge, Presiding D.C. No. CV-97-00858-GEB (JFM)
 Before: William C. Canby, Jr., Michael Daly Hawkins, and Ronald M. Gould, Circuit Judges.
 
 Hawkins, Circuit Judge
 OPINION
 
 1
 This appeal concerns the authority of the U.S. Army Corps of Engineers ("the Corps") and the Environmental Protection Agency ("EPA") over a form of agricultural activity called "deep ripping" when it occurs in wetlands. We conclude that the Clean Water Act applies to this activity and affirm the district court's findings that Borden Ranch violated the Act by deep ripping in protected wetland swales. We reverse the district court's findings of liability with respect to isolated vernal pools in light of Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs, 531 U.S. 159 (2001), and remand for a recalculation of the civil penalties.
 
 Facts and Procedural Background
 
 2
 In June of 1993, Angelo Tsakopoulos, a Sacramento real estate developer, purchased Borden Ranch, an 8400 acre ranch located in California's Central Valley. Prior to Tsakopoulos's purchase, the relevant areas of the ranch had been used primarily as rangeland for cattle grazing. The ranch contains significant hydrological features including vernal pools, swales, and intermittent drainages. Vernal pools are pools that form during the rainy season, but are often dry in the summer. Swales are sloped wetlands that allow for the movement of aquatic plant and animal life, and that filter water flows and minimize erosion. Intermittent drainages are streams that transport water during and after rains. All of these hydrological features depend upon a dense layer of soil, called a "restrictive layer" or "clay pan, " which prevents surface water from penetrating deeply into the soil.
 
 
 3
 Tsakopoulos intended to convert the ranch into vineyards and orchards and subdivide it into smaller parcels for sale. Vineyards and orchards, however, require deep root systems, much deeper than the restrictive layer in the relevant portions of Borden Ranch permitted. For vineyards and orchards to grow on this land, the restrictive layer of soil would first need to be penetrated. This requires a procedure known as"deep ripping," in which four-to seven-foot long metal prongs are dragged through the soil behind a tractor or a bulldozer. The ripper gouges through the restrictive layer, disgorging soil that is then dragged behind the ripper.
 
 
 4
 Under the Clean Water Act, an individual seeking to fill protected wetlands must first obtain a permit from the Corps. Since 1993, Tsakopoulos and the Corps have disagreed about the Corps' authority to regulate deep ripping in wetlands. Tsakopoulos initiated deep ripping without a permit in the fall of 1993, and the Corps granted him a retrospective permit in the spring of 1994, when Tsakopoulos agreed to various mitigation requirements. In the fall of 1994, the Corps and the EPA informed Tsakopoulos that he could deep rip in uplands and that he could drive over swales with the deep ripper in its uppermost position, but that he could not conduct any deep ripping activity in vernal pools. The next spring, the Corps discovered that deep ripping had occurred in protected wetlands and promptly issued a cease and desist order. From July 1995 through November 1995, Tsakopoulos again initiated deep ripping on various parcels of land without a permit. The Corps concluded that more protected wetlands had been ripped and again issued a cease and desist order.
 
 
 5
 In May of 1996, the Corps and the EPA entered into an Administrative Order on Consent with Tsakopoulos that was intended to resolve his alleged Clean Water Act violations. Under the agreement, Tsakopoulos set aside a 1368-acre preserve and agreed to refrain from further violations.
 
 
 6
 In December of 1996, the Corps and the EPA issued a regulatory guidance letter that distinguished deep ripping from normal plowing activity. The letter stated that deep ripping in wetlands "destroy[s] the hydrological integrity of these wetlands" and therefore "requires a permit under the Clean Water Act."[1]
 
 
 7
 In March of 1997 the Corps concluded that Tsakopoulos had continued to deep rip wetlands without permission. That April, EPA investigators visited the ranch and observed fully engaged deep rippers passing over jurisdictional wetlands. EPA then issued an Administrative Order to Tsakopoulos.
 
 
 8
 Tsakopoulos responded by filing this lawsuit, challenging the authority of the Corps and the EPA to regulate deep ripping. The United States filed a counterclaim seeking injunctive relief and civil penalties for Tsakopoulos's alleged violations of the Clean Water Act.
 
 
 9
 Both parties filed motions for summary judgment. The district court ruled that the Corps has jurisdiction over deep ripping in jurisdictional waters. However, the court found disputed facts with respect to whether such deep ripping had actually occurred. These facts were litigated in a bench trial that began on August 24, 1999, and concluded on September 16, 1999. The district court heard evidence from over twenty witnesses and received hundreds of documentary exhibits.
 
 
 10
 The district court subsequently entered findings of fact and conclusions of law determining that Tsakopoulos had repeatedly violated the Clean Water Act. The court found 348 separate deep ripping violations in 29 drainages, and 10 violations in a single vernal pool. The district court gave Tsakopoulos the option of paying a $1.5 million penalty or paying $500,000 and restoring four acres of wetlands. Tsakopoulos chose the latter option. After denying a motion for more specific findings of fact, the district court entered its final order in favor of the United States.
 
 
 11
 Tsakopoulos then brought this timely appeal. We have jurisdiction under 28 U.S.C. §§ 1291.
 
 Analysis
 I. Corps Jurisdiction Over Deep Ripping
 
 12
 The Clean Water Act prohibits"the discharge of any pollutant" into the nation's waters. 33 U.S.C.§§ 1311(a). The nation's waters have been interpreted to include wetlands adjacent to navigable waters. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133-35 (1985). The Act defines discharge as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C.§§ 1362(12). A point source is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. §§ 1362(14). A pollutant is defined, inter alia, as "dredged spoil, . . . biological materials, . . . rock, sand, [and] cellar dirt." 33 U.S.C. 1362(6). It is unlawful to discharge pollutants into wetlands without a permit from the Army Corps of Engineers. 33 U.S.C. §§ 1344(a),(d).
 
 A. Discharge of a Pollutant
 
 13
 Tsakopoulos initially contends that deep ripping cannot constitute the "addition" of a "pollutant " into wetlands, because it simply churns up soil that is already there, placing it back basically where it came from. This argument is inconsistent with Ninth Circuit precedent and with case law from other circuits that squarely hold that redeposits of materials can constitute an "addition of a pollutant" under the Clean Water Act. Rybachek v. United States Envtl. Prot. Agency, 904 F.2d 1276 (9th Cir. 1990), considered a claim that placer mining activities were exempt from the Act. We held that removing material from a stream bed, sifting out the gold, and returning the material to the stream bed was an"addition" of a "pollutant." Id. at 1285. The term"pollutant" encompassed "the materials segregated from gold in placer mining." Id.
 
 
 14
 Our reasoning in Rybachek is similar to that of the Fourth Circuit in United States v. Deaton, 209 F.3d 331 (4th Cir. 2000). In Deaton, a property owner alleged that the Corps could not regulate "sidecasting," which is"the deposit of dredged or excavated material from a wetland back into that same wetland." Id. at 334. The property owner asserted that "sidecasting results in no net increase in the amount of material present in the wetland" and therefore could not constitute the "addition of a pollutant." Id. at 335. The Fourth Circuit squarely rejected this argument, in language that is worth quoting in full:
 
 
 15
 Contrary to what the Deatons suggest, the statute does not prohibit the addition of material; it prohibits the "addition of any pollutant." The idea that there could be an addition of a pollutant without an addition of material seems to us entirely unremarkable, at least when an activity transforms some material from a nonpollutant into a pollutant, as occurred here . . . . Once [earth and vegetable matter] was removed [from the wetland], that material became "dredged spoil," a statutory pollutant and a type of material that up until then was not present on the Deaton property. It is of no consequence that what is now dredged spoil was previously present on the same property in the less threatening form of dirt and vegetation in an undisturbed state. What is important is that once that material was excavated from the wetland, its redeposit in that same wetland added a pollutant where none had been before.
 
 
 16
 Id. at 335-36. As the court concluded, "Congress determined that plain dirt, once excavated from waters of the United States, could not be redeposited into those waters without causing harm to the environment." Id. at 336; see also Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 923 (5th Cir. 1983) (holding that the word "addition" may be reasonably understood to include "redeposit").
 
 
 17
 These cases recognize that activities that destroy the ecology of a wetland are not immune from the Clean Water Act merely because they do not involve the introduction of material brought in from somewhere else. In this case, the Corps alleges that Tsakopoulos has essentially poked a hole in the bottom of protected wetlands. That is, by ripping up the bottom layer of soil, the water that was trapped can now drain out. While it is true, that in so doing, no new material has been "added," a "pollutant" has certainly been "added." Prior to the deep ripping, the protective layer of soil was intact, holding the wetland in place. Afterwards, that soil was wrenched up, moved around, and redeposited somewhere else. We can see no meaningful distinction between this activity and the activities at issue in Rybachek and Deaton. We therefore conclude that deep ripping, when undertaken in the context at issue here, can constitute a discharge of a pollutant under the Clean Water Act.[2]
 
 
 18
 Tsakopoulos also contends that no case has ever held a plow to be a point source, and that a prohibited discharge must be from a point source. This argument has no merit. The statutory definition of "point source" ("any discernible, confined, and discrete conveyance") is extremely broad, 33 U.S.C. §§ 1362(14), and courts have found that"bulldozers and backhoes" can constitute "point sources, " Avoyelles, 715 F.2d at 922. In this case, bulldozers and tractors were used to pull large metal prongs through the soil. We can think of no reason why this combination would not satisfy the definition of a "point source."
 
 B. The Normal Farming Exception
 
 19
 Tsakopoulos next contends, that even if deep ripping constitutes a discharge of pollutants, it is nonetheless exempt from regulation under the "farming exceptions, " which state that discharges "from normal farming . . . and ranching activities, such as plowing" are not subject to the Clean Water Act. 33 U.S.C. §§ 1344(f)(1)(A). The section of the statute containing the farming exceptions, however, includes a significant qualifying provision:
 
 
 20
 Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.
 
 
 21
 33 U.S.C. §§ 1344(f)(2). Thus, even normal plowing can be regulated under the Clean Water Act if it falls under this so-called "recapture" provision. See Avoyelles, 715 F.2d at 925 (noting that §§ 1344(f)(2) can preclude the normal farming exceptions).
 
 
 22
 We conclude that the deep ripping at issue in this case is governed by the recapture provision. Converting ranch land to orchards and vineyards is clearly bringing the land"into a use to which it was not previously subject," and there is a clear basis in this record to conclude that the destruction of the soil layer at issue here constitutes an impairment of the flow of nearby navigable waters.
 
 
 23
 Although the Corps cannot regulate a farmer who desires "merely to change from one wetland crop to another," activities that require "substantial hydrological alterations" require a permit. United States v. Akers, 785 F.2d 814, 820 (9th Cir. 1986). As we have explained, "the intent of Congress in enacting the Act was to prevent conversion of wetlands to dry lands," and we have classified "as non-exempt those activities which change a wetland's hydrological regime." Akers, 785 F.2d at 822. In this case, Tsakopoulos's activities were not intended simply to substitute one wetland crop for another; rather they radically altered the hydrological regime of the protected wetlands. Accordingly, it was entirely proper for the Corps and the EPA to exercise jurisdiction over Tsakopoulos's activities.
 
 II. The Vernal Pool
 
 24
 The district court found Clean Water Act violations in one isolated vernal pool on Tsakopoulos's property. Earlier this year, the Supreme Court ruled in Solid Waste that the Corps' rule extending the definition of "navigable waters" under the Clean Water Act to include intrastate waters used as habitat for migratory birds exceeds the authority granted to the Corps under the Clean Water Act. The government now concedes that Solid Waste precludes Corps' authority over the vernal pool in dispute and has formally withdrawn its enforcement claim with respect to the pool. We accordingly reverse the district court's findings of Clean Water Act violations in the vernal pool.
 
 III. The District Court's Factual Findings
 
 25
 Tsakopoulos challenges the district court's factual findings of violations of the Clean Water Act. We review for clear error. Ambassador Hotel Co. v. Wei-Chuan Inv. , 189 F.3d 1017, 1024 (9th Cir. 1999).
 
 
 26
 Tsakopoulos argues that "there was no substantial evidence at all" to support the court's factual findings of deep ripping in protected swales. He argues that the evidence can only demonstrate shallow ripping consistent with the ripper in its uppermost position, which was permitted under the government's direction.
 
 
 27
 "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Cree v. Flores, 157 F.3d 762, 768 (9th Cir. 1998). The district court here held a four-week bench trial, examined numerous exhibits, and heard over twenty witnesses. There is ample evidence to support the district court's findings. The court cited documentary evidence showing deep ripping, eye-witness testimony of deep ripping on the property, and Tsakopoulos's own concession that "mistakes had been made." The court also relied on the studies of Dr. Lyndon Lee, who conducted extensive investigations at the site. Dr. Lee was able to dig soil pits as far as thirty inches into the soil. By examining the composition of the soil in these pits, Dr. Lee could determine whether the underlying clay layer had been ripped up, consistent with deep ripping. The district court chose to credit this evidence that deep ripping had occurred, and we can find no clear error on this record.
 
 IV. The Civil Penalty
 
 28
 The district court found that Tsakopoulos had committed 358 violations of the Clean Water Act. It counted each pass of the ripper through a protected wetland as a separate violation. The statute provides for a maximum penalty of"$25,000 per day for each violation." 33 U.S.C. §§ 1319. The statutory maximum penalty was therefore $8,950,000. The court then considered a variety of factors in setting the penalty. The court found that Tsakopoulos "risked damaging rare federal wetlands because of his motivation to reap economic gain." The court also found an "absence of a good faith attempt to comply with the Act." The court accordingly set the penalty at $1,500,000, which is $7,450,000 below the statutory maximum. The court also allowed Tsakopoulos to suspend $1,000,000 of the penalty if he performed various restoration measures.
 
 
 29
 Tsakopoulos now makes three challenges to the district court's calculation of the civil penalty. We conclude that none of these arguments has merit.
 
 A. Penalty Calculation per Violation
 
 30
 Tsakopoulos first contends that the penalty should have been based on the number of days in which illegal ripping occurred, not on the number of individual passes with the ripper. He argues that the statutory language "per day for each violation" means that he can only be assessed $25,000 for any day in which ripping violations occurred, regardless of the total number of rippings in that day.
 
 
 31
 We disagree. The statute imposes a maximum penalty"per day for each violation." 33 U.S.C. §§ 1319(d). It does not say "per each day in which violations occur" or"per day in which a party pollutes." The focus is clearly on each violation, and courts have consistently rejected attempts to limit civil penalties to the number of days in which violations occur. A contrary rule would encourage individuals to stack all their violations into one "Pollution Day," in which innumerable offenses could occur, subject only to the $25,000 maximum.
 
 
 32
 Tsakopoulos relies most heavily on Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 791 F.2d 304 (4th Cir. 1986), vacated, 484 U.S. 49 (1987). In Gwaltney, the court considered a case of continuous violations of monthly permits. The violator argued that a monthly violation should be treated as a single day of violation. Id. at 313. The court disagreed, concluding "where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period." Id. at 314. The court explicitly declined to reach the very different question of "whether multiple violations attributable to a single day may give rise to a maximum penalty in excess of [the penalty amount] for that day." Id. at 308.
 
 
 33
 This question was addressed in Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128 (11th Cir. 1990). The court found that the statutory provision was "not a model of clarity," but nonetheless found that it was "capable of only a single reasonable interpretation: the daily maximum penalty applies separately to each violation of an express limitation." Id. at 1137, 1138. The court stated that "each excessive discharge of a pollutant on a given day will subject the polluter to a $25,000 maximum fine." Id. at 1139. This interpretation was consistent with the legislative history, which stated that the provision was intended "to clarify that each distinct violation is subject to a separate daily penalty assessment." Id. (citation omitted).
 
 
 34
 The Fourth Circuit adopted similar reasoning in United States v. Smithfield Foods, Inc., 191 F.3d 516, 528 (4th Cir. 1999). The court noted the serious incentive problems of a contrary ruling: "[I]f the maximum penalty that could be levied against a violator on a single day was $25,000, no matter how many different Permit effluent limitations were violated, the permittee would have a strong disincentive to comply with the other permit limitations." Id. at 527-28. Accordingly, the court treated each permit violation "as a separate and distinct infraction for purposes of penalty calculation." Id. at 528.
 
 
 35
 We recognize that these cases do not precisely resolve the problem at issue here. These cases are concerned with emission of different types of pollutants in violation of different permits. This case is about repeated filling of wetlands without a permit. Here, the landowner committed the same unlawful act repeatedly. Tsakopoulos argues that treating each rip as a separate violation could lead to nonsensical results in other cases. For example, a polluter who emitted 25,000 gallons of a pollutant into a stream continuously over the course of a day would be subject to a $25,000 maximum penalty, whereas a polluter who made three separate discharges of one gallon each would be subject to a $75,000 maximum penalty.
 
 
 36
 Tsakopoulos's position, however, also leads to irrational results. The incentive problems at issue in Smithfield are equally strong here. Once a wetland violation has occurred in part of a swale, Tsakopoulos's proposed rule would allow the landowner to rip away at the rest of the swale with impunity from that point forward, because no additional penalty could be imposed.
 
 
 37
 Although neither approach is free from difficulty, we believe the better rule is to treat each rip as a separate violation. This approach is more consistent with the statutory langauge, with prior judicial interpretations of the statute, and with the general policy goal of discouraging pollution. Tsakopoulos's concern about the disparate treatment of the polluter who emits several small amounts and the serial continuous polluter is not without remedy in the district courts. The district courts have substantial discretion in imposing penalties, and, as the Gwaltney court pointed out in response to a similar argument, the district court "could . . . impose a substantially smaller penalty on [the] hypothetical polluter than on [the larger polluter]." 791 F.2d at 315.
 
 
 38
 In sum, we conclude that the district court correctly included each pass of the ripper as a separate violation. A limited remand for recalculation of the penalty is nonetheless in order. The district court included 10 passes through the vernal pool in its total of 358 violations. Since the government now concedes that it lacks jurisdiction over these violations, we remand to the district court to determine what, if any, reduction in the penalty is appropriate.
 
 B. The Simpson Timber Consent Decree
 
 39
 Tsakopoulos argues that the penalty imposed here is significantly disproportionate to the penalty imposed in the settlement of violations by the Simpson Timber Company, which deep ripped 987 acres, but was subject only to a $30,000 penalty and a restoration order. By contrast, Tsakopoulos committed violations on only two acres. The district court found that the Simpson Timber consent decree had no relevance to the determination of the civil penalty here, because consent decrees are different from judgments reached after extensive litigation and because that decree imposed significant restoration requirements.
 
 
 40
 The district court did not abuse its discretion. Tsakopoulos knowingly assumed the risk that litigation would result in a judgment more unfavorable than he might have attained through settlement. Having assumed that risk, Tsakopoulos cannot now be heard to complain that his penalty should have been assessed as if he had settled the case. In any event, the statute directs that these disputes be evaluated on a case-by-case basis. Since we know almost nothing about the facts of the Simpson Timber dispute, it is impossible to conclude that the district court's careful analysis of the penalty issue on the facts of this case was an abuse of discretion.
 
 C. Further Reductions in Penalty
 
 41
 Tsakopoulos finally argues that the district court should have reduced the penalty further because of Tsakopoulos's good faith, the trivial nature of the violations, and the supposed uncertainty concerning the government's regulatory authority. The district court considered these arguments when setting the penalty (a penalty that was significantly lower than the statutory maximum). None of Tsakopoulos's arguments rises to the level necessary to demonstrate an abuse of discretion by the district court.
 
 Conclusion
 
 42
 We affirm the district court's holding that deep ripping in this context is subject to the jurisdiction of the Corps and the EPA. We also affirm the district court's factual findings except with respect to the vernal pools. We remand for a recalculation of the civil penalties. Finally, we deny Tsakopoulos's request that this case be assigned to a different district judge on remand.
 
 
 43
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.
 
 
 44
 Costs on appeal to appellees.
 
 
 
 Notes:
 
 
 [1]
 In the district court, Tsakopoulos argued that this letter was invalid. The district court found that "it is unclear whether the regulatory guidance letter has actually been applied to Plaintiffs. Therefore decision is reached without reference to it." The district court also found that "any as-applied challenge to the regulations that might also include a challenge to the application of the [regulatory guidance letter ] is not ripe." On appeal, Tsakopoulos again challenges the regulatory guidance letter, arguing for the first time that the letter is a substantive rule that required notice-and-comment rule making. Since this new argument was not presented to the district court, we decline to consider it on appeal. See Nelson v. City of Irvine, 143 F.3d 1196, 1205-06 (9th Cir. 1998).
 
 
 [2]
 National Mining Assoc. v. U.S. Army Corps of Eng'rs, 145 F.3d 1399 (D.C. Cir. 1998), upon which Tsakopoulos heavily relies, does not persuade us to the contrary. That case distinguished "regulable redeposits" from "incidental fallback." Id. at 1405. Here, the deep ripping does not involve mere incidental fallback, but constitutes environmental damage sufficient to constitute a regulable redeposit.
 
 
 GOULD, Circuit Judge, dissenting:
 
 45
 I respectfully dissent. The crux of this case is that a farmer[1] has plowed deeply to improve his farm property to permit farming of fruit crops that require deep root systems, and are more profitable than grazing or other prior farm use. Farmers have been altering and transforming their crop land from the beginning of our nation, and indeed in colonial times. Although I have no doubt that Congress could have reached and regulated the farming activity challenged, that does not in itself show that Congress so exercised its power. I conclude that the Clean Water Act does not prohibit "deep ripping" in this setting.
 
 
 46
 I would follow and extend National Mining Association v. U.S. Army Corps of Engineers, 145 F.3d 1399 (D.C. Cir. 1998), and hold that the return of soil in place after deep plowing is not a "discharge of a pollutant." In National Mining, the court held that the Corps exceeded its authority under section 404 of the Clean Water Act by regulating the redeposit of dredged materials that incidentally fall back in the course of dredging operations. The court explained that "the straightforward statutory term `addition' cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back." Id. at 1404. The court rejected the agencies' primary argument that incidental fallback constitutes an "addition" because once dredged the material becomes a pollutant:
 
 
 47
 Regardless of any legal metamorphosis that may occur at the moment of dredging, we fail to see how there can be an addition of dredged material when there is no addition of material. Although the Act includes "dredged spoil" in its list of pollutants, Congress could not have contemplated that the attempted removal of 100 tons of that substance could constitute an addition simply because only 99 tons of it were actually taken away.
 
 
 48
 Id. at 1404 (emphasis omitted).
 
 
 49
 Those considerations are persuasive here as deep ripping does not involve any significant removal or "addition" of material to the site. The ground is plowed and transformed. It is true that the hydrological regime is modified, but Congress spoke in terms of discharge or addition of pollutants, not in terms of change of the hydrological nature of the soil. If Congress intends to prohibit so natural a farm activity as plowing, and even the deep plowing that occurred here, Congress can and should be explicit. Although we interpret the prohibitions of the Clean Water Act to effectuate Congressional intent, it is an undue stretch for us, absent a more clear directive from Congress, to reach and prohibit the plowing done here, which seems to be a traditional form of farming activity.
 
 
 50
 Rybachek v. United States Environmental Protection Agency, 904 F.2d 1276 (9th Cir. 1990), in my view, is distinguishable. In Rybachek, we held that placer mining, "a process in which miners excavate dirt and gravel in and around waterways and, after extracting the gold, discharge the left-over material back into the water," fell within the scope of section 404 of the Clean Water Act. Id. at 1285. There, the Rybachek court identified the regulable discharge as the discrete act of dumping leftover material into the stream after it had been processed. Id. As the concurrence in National Mining makes clear, however, "the word addition carries both a temporal and geographic ambiguity. If the material that would otherwise fall back were moved some distance away and then dropped, it very well might constitute an `addition.' Or if it were held for some time and then dropped back in the same spot, it might also constitute an `addition.' " National Mining, 145 F.3d at 1410 (Silberman, J., concurring). Because deep ripping does not move any material to a substantially different geographic location and does not process such material for any period of time, Rybachek is not controlling.
 
 
 51
 Nor is the Fourth Circuit's opinion in United States v. Deaton, 209 F.3d 331 (4th Cir. 2000), relied on by the majority, persuasive to me in the context presented. A farmer who plows deeply is not, in my view, redepositing dredged or excavated materials. While the Fourth Circuit relied on the fact that a "dredged spoil" is a statutory pollutant, the deep plowing activity here, in my view, is not the same as dredging dirt from and redepositing it in waters.
 
 
 52
 Also, even assuming that deep ripping can be viewed as a discharge of a pollutant into navigable waters, it seems at first consideration exempt as a normal farming activity. The Clean Water Act exempts normal farming activity, including plowing. See 33 U.S.C. §§ 1344(f)(1)(A). The exemption as cast by Congress is not limited to shallow plowing, but would appear literally to cover the deep plowing technique referred to as deep ripping.
 
 
 53
 This exemption, however, does not apply by its terms to "any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject." See 33 U.S.C. §§ 1344(f)(2). Moreover, the Corps of Engineers, by regulation, has provided explicitly that the plowing exemption does not include "redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dry land." 33 C.F.R. §§ 323.4(a)(1)(iii)(D). The Corp's regulation, which we upheld in United States v. Akers, 785 F.2d 814, 819-20 (9th Cir. 1986), must be read consistent with the statute's terms. Although this limitation defeats the exemption for any deep ripping that had the purpose of transforming land, it does not, in my view, defeat the exemption as to any unintended impairment. Most violations found by the district court involved a purposeful attempt to transform the land. But some of the transgressions (indentations in swales caused by moving the deep ripper to different locations) found by the district court here were apparently unintentional, or at least there was no finding by the district court of purposeful modification as to all of the violations.
 
 
 54
 I would hold that the district court erred in finding that the activities here required a permit and otherwise violated the Clean Water Act. The problem of interpretation here arises because Congress prohibited the discharge or addition of any pollutant to navigable waters from any point source. It did not literally prohibit any conduct by farmers or ranchers that changes the hydrological character of their land. The majority opinion, motivated perhaps by the purposes of the statute, makes new law by concluding that a plow is a point source and that deep ripping includes discharge of pollutants into protected waters. The policy decision involved here should be made by Congress, which has the ability to study and the power to make such fine distinctions. I understand how the majority reaches its position based on Rybachek , and incremental judicial reasoning. Notwithstanding, the judicial determination that a deep plowing technique constitutes a pollution of navigable waters, with no prior adequate guidance from Congress, goes beyond mere statutory interpretation. It would be preferable for the public, the regulators, and us were Congress to speak explicitly on the subjects of what normal farming or ranching activities may include discharge of pollutants and require permits under the Clean Water Act, and whether it wishes to exempt any such activities and upon what terms. The alternatives are an agency power too unbounded or judicial lawmaking, which is worse. I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Appellant, Angelo Tsakopoulos, is referred to by the majority as a "real estate developer." As the owner of Borden Ranch, which apparently engaged in both farming and ranching activities, it seems to me correct to refer to him as a farmer or a rancher, in addition to being a developer. Whether viewed as a farmer, rancher, or developer, his rights as a citizen are the same. Because the challenged activities in this case arise on land previously used for rangeland for cattle grazing, and his deep ripping was converting the land for orchard and vineyard farming, I consider him as a farmer and rancher, and the issues raised by his position in this litigation may impact farmers and ranchers regardless of whether they plan to sell portions of improved land.